Chief Judge Owen, and may it please the court, I am Mike Wallace, counsel for Governor Reeves and Secretary Watson, who is here in court with us this morning. I accepted the court's – I declined the court's kind offer not to ask me questions for a few minutes, but I do want to take one minute to say how I intend to proceed. The plaintiffs say this is a purely statutory case, but they failed to quote Section 2 of the Voting Rights Act even once in their brief, and they ignored Judge Willett's demonstration in his panel dissent that the three-judge statute can be diagrammed two different ways with two different meanings. The heart of the case, if you get there, is whether a black voter age population majority has, in the words of Section 2, less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, as compared to the non-black minority in this district. This case also presents jurisdiction in laches questions. I will address jurisdiction, or at least I intend to, at the close of my argument, and Mr. Fredericks of Texas will spend his five minutes on laches. Here, the district court decided that a black voting majority has less opportunity than a non-black voting minority. Because that's wrong as a matter of math, it is also wrong as a matter of plain-meaning statutory construction, and also as a matter of fact on the evidence in this case, which I intend to address after I look at the law. Neither this court nor the Supreme Court has ever held that a racial majority of voters lacks an opportunity equal to a racial minority of voters. In a single member district context, which is what we have here, DeGrande and Lumac v. Perry all say that plaintiffs, much so that the legislators could have created another black majority district. That's not here. The Bartlett case we read is saying a black majority district is defined as 50% plus 1. The legislature did that here. And as a matter of fact, last Friday, this court in the Harding case says even if you can create another black majority district, there has to be some evidence that the district you create will actually perform better for black voters than the district the legislature created. No such evidence appears in this record. This is reversible on the basis of Harding alone. Now, the Supreme Court and Lumac v. Perry acknowledge the possibility that an apparent Latin majority district might be what they called hollow, a district where noncitizens reduced a population majority to a voting minority. That's not this case. This court has never, in a single member district context, addressed the issue directly. That's not surprising. Statewide redistrictings don't come to this court. They're appealed to the context of at-large local elections, cases like Zimmer and Monroe and Salas. And in Zimmer and Monroe, even though there were black population majorities in those very old cases, there were black registered voter minorities. And that is why the court granted Section 2 relief. There was in fact no voting majority in either Zimmer or Monroe. Salas is the opposite case that proves the rule. There was a registered voter Hispanic majority in Salas and the court granted no relief, said you don't need Section 2 relief under those circumstances. Now, Salas suggested again in that at-large context that a population majority might be illusory if low turnout was caused by prior official discrimination. You have a majority, but you can't get it to the polls because of constitutional violations. But they said very clearly, you have to prove causation. You have to prove that illusory majority is caused by unconstitutional conduct. That was not alleged. That was not proven in this case. It wasn't proven in Salas. There was no relief. We do not believe, as we've explained in our brief, that the illusory majority language of Salas ought to be applied in any event to single-member district cases, which are far more complex than at-large cases. There's two big reasons. The injury is different. The proof is different. In Salas and Kirksey and Monroe and Zimmer, you had at-large elections year after year. The minority never won. The minority had no power. They were shut out. That is not this case. The plan passed by our legislature in 2012 and approved by the Justice Department the same year elected 13 black senators. That is 25% of the total. The court said the injury in this case was that you had 13 black senators instead of 14. Now, if you really have a Section 2 violation, I don't deny that's an injury, but it's certainly not the shutout that this court was addressing in cases like Zimmer and Kirksey. And maybe more important, the proof is a problem. Teague, the Teague case, says you need many elections to prove a Section 2 violation. In the at-large cases, you have many elections. They don't change their boundaries every 10 years. You have a long record going back for many years to see who comes out to vote and who wins. And that vote will show you, will prove, in fact, if minority participation is depressed. That's not what happens in a single-member district. The legislature in 2012 created 174 different legislative districts. It would be amazing if in the course of an entire decade you could not find one expert to say there was depressed population in one election in one district. And that's all this record shows. And when we get to the facts, I'll tell you why that is not, in fact, the case here. So the illusory majority case theory from Salas we think is very dangerous and should not be applied in a single-member district context. Judge Avison. There is language in Jingles and Bartlett to say that a majority-minority district means a working or effective majority. There are certainly adjectives in the Supreme Court decisions that talk about working majorities and effective majorities. I will say I read 50% majority. I think that's the way Judge Souter read it and Justice Souter read it in his dissent, too. He read it as saying 50% plus 1 satisfies Section 2. We quoted that in our brief. That's the way I read it. Okay, but can you give me any circuit case that's held differently than a minority-majority means an effective or working majority? Can you give me any circuit case that reads the case law that way? I can't find either a circuit case or a Supreme Court case that defines what an effective majority is. I don't deny that the adjective is in the cases, but it doesn't define it and particularly doesn't put a number on it. I will tell you at the Supreme Court level, the very first Section 2 case was Jordan v. Winner. Judge Clark and his colleagues on the three-judge court created a congressional district in the Mississippi Delta, same territory we're talking about here, that had a 52% black majority. Mr. McDuff's jurisdictional statement said to the Supreme Court, that's not effective, that's not working, we need 65, and he lost. Judge Stevens' concurrence, and I understand the concurrence in a summary affirmance, is not controlling, but he used those terms. He said 52% is an effective majority. I don't think there's any decision of any court anywhere that says 52% is not an effective majority. It's a black-bound case. It doesn't depend on the district. I mean, whether, the question is whether it's effective to give the minorities an equal right to elect a representative of their choice. So isn't that fact-bound always? It is fact-bound, but it is, but there has been no finding of fact by any court that says when you have a majority, when you don't have depressed turnout, unless you can show some unconstitutional obstacle, absent those obstacles, that's not an effective majority. The Supreme Court, until now, that I've been able to find, has said that a majority is not, in fact, a majority. Here, that's what the court said. I don't think there are any cases anywhere to back that up, and I will get, we've got an 8th Circuit case, 10th Circuit case, both in single-member districts, where the court held that the, that it took more than 50% to be an effective majority. I mean, it's, the percentage is going to differ in every case, isn't it? I don't think it will, it will, it will differ in every case if you have proof of an obstacle. If you have proof of what this Court said in Solace, yes, you have a majority, but there is some unconstitutional behavior that has kept you from effectuating that majority, that there is some behavior that has kept you from getting your, from getting your majority to the polls. That is what you have to say, and there may be cases, although the 8th Circuit case, if I'm, if it's the Ferguson case, was an at-large case, not a single-member district case. The 10th Circuit case, as I remember, was two super-majorities for Indian districts. Hope was a single-member district out of the 8th Circuit. Say what? Hope. Hope. Yeah. I'll take Your Honor's word for it. Yes, didn't the district court find that there was an obstacle that, that kept the minority here from being able to, to have an opportunity district? The district court here found that turnout was depressed, and that is the factual error on which, that is the factual error which the court made. There is no evidence that turnout is depressed, not evidence that meets this, this, uh, this Court's standard in cases like Ron Hill and Teague and Rodriguez. So, the only . . . I want to ask about mootness. We asked you to file a brief, and you basically said even though the election has happened, the case is not moot because, um, the Senate could decide if we were to reverse to vacate, to kick out the two members who were elected under these districts. Um, but then you say, I think on page four, this Court's refusal to consider the appeal if we found it moot and vacated the district court decision would lead to exactly the same result, meaning those Senators could be expelled and a new election is held. Isn't that the definition of mootness, if the same result attaches if you were to win this appeal and we were to find it moot and vacate? Well, in the first place, counsel opposite says that it won't be vacated, and I think it must under Bank Corp. Um, but as this Court found in the panel decision, Judge Costa, we've got to . . . we have a declaratory judgment to live with, uh, in this case. It hangs over our head. We think it ought to be resolved, and we think it ought to be resolved on merits. If it's vacated, you say you'd be in the same situation as if you won. So why isn't that moot? I suppose, Your Honor, if you decide to vacate it, we win. The district decision goes away. You have a very, you've got a very big fight right now about whether it should be vacated. But as long as that district court decision gets off the books and it's as if the case had never been brought, then, uh, then we get to the same result. The Senate is entitled to consider itself. Yes, that's right. Mr. Wallace, what about the, uh, existence of the new district lines that have been passed by the Legislature? Won't that be the starting point? What will be the starting point after redistricting in, uh, 2020? I think now that Section 5 is gone, Judge Jones, every decade's a brand new day. Well, but, but isn't it normally a fact that, uh, whoever the incumbents are get special consideration in redistricting? That is absolutely the fact as a practical matter. It's got nothing to do with federal law, but as a practical matter, the people who are in the Senate and can protect themselves, yes, they get different consideration. But as a legal matter, I don't think it's going to matter what the lines are because you don't have to go back to Washington and show any lack of retrogression. You get, you can throw it all out and start from scratch if you want. Well, I understand that, but as a prior, Reno v. Bossier-Perry suggested that was a reason for not holding a case moot. Here, you know, here, Your Honor, if you vacate the judgment, then it's going to be up to the Senate. The Senate can decide whether they want to hold the lines or the ones that they use. If the Senate says, no, we're happy with these two people, we'll keep them, we'll keep these lines, then they'll be there to protect themselves in the redistricting. So as long as the Senate gets to act on behalf of the state of Mississippi, that's what we're asking for. It should be up to them. The case is moot so long as the district court opinion is vacated. I think if, if it goes, if it, if this court decides all of this never happened, then I think the case is moot. But we're going to hear an argument about whether it should be vacated. But only, it seems to me, if the whole case is thrown out. At that point, the Senate can do what it wants to do, and this court can go on about its business. Your position that if the determination of the case is moot, that the two newly elected Senators just automatically are not in an electoral district? In other words, the Senate has to determine them unqualified? The Senate has the option. Under Mississippi law, our case law is pretty strong. The internal affairs of the legislature are for the legislature to decide. If this judgment no longer poses an obstacle, then up to the Senate. So we don't have, the executive branch doesn't have a position on what the Senate should do or will do. We do have a position that this court ought to allow the Senate to do what the Mississippi Constitution permits it to do. Mr. Wallace. The State has no idea what the Senate plans to do. We have no communication from the Senate. This is not the Senate that passed this law last year. It's a brand new Senate, and we don't know what they'll do. Do you have any, any Mississippi law that says the two Senators who are sitting now from the two districts should be disqualified, or there would be grounds for disqualification? No court, no court has ever changed the lines in the middle of the, in the middle of an election before, so we have no law. Our law does say the Senate's in charge, not the Supreme Court. Judge Elrod. Mr. Wallace, are you indifferent as to whether or not we just find it moot as long as we vacate, and whether we grant you any other relief? I mean, is that, you don't care one way or the other, is that correct? We don't want any relief from the district court. We're not asking the district court to order new elections. We're just asking the district court to go away and let the Senate do what it wants to do. But is it your position that the Senate could have a member that is wildly unpopular in the Senate, but wildly popular in his or her district, and they can just get rid of this person by saying, well, let's shift this district a little and say they're unqualified? No, no, no. It's our position that we— They were lawfully elected at the time. Mootness doesn't mean that nothing ever happened. But it does mean that, it does mean that there are two Senators sitting in a district from which they were not elected. The lines revert. Section 42 says if you're not residing where you were elected before, then you can be removed. This is a peculiar situation. Never happened before, will never happen again. But these two districts will no longer exist if this plan is vacated. I was going to— Let me say one word about the facts. There's only one election here. The big— We don't dispute, we don't dispute the polarity of the vote, but we do dispute turnout. There's only one turnout election. The earlier three elections did not consider turnout in two new counties, being Yazoo and Madison. The only good election is 2015. They missed 10 percent of the vote. Ron Hell says one election isn't good enough to prove anything, particularly when you don't count 10 percent of the votes. There's no proof of low turnout. Chief Judge Owen, may it please the Court, Matthew Frederick for the states of Texas and Louisiana. I want to focus on latches because it should have precluded the plaintiff's claims entirely, and it provides a sufficient basis for this Court to vacate the judgment below. I want to start by— Two questions on latches. One, what's your best voting rights case finding an abusive discretion by a district court that refused to apply latches? And two, how do you deal with the classic Section 2 case, which is a challenge to an at-large districting scheme that often comes decades after that at-large system was put into place? Judge Costa, to answer your first question, I think the closest case on the facts to this one is a case—is the Maryland Citizens case from the Fourth Circuit, and that's the one where they filed something like 13 weeks before a candidate qualifying deadline. That's actually very close to this case because by the time there was a discovery schedule in place, there were less than three months, I think, or less than four months until the end of the candidate qualifying deadline. As far as the at-large elections, the difference here is that in an at-large election, nothing ever changes. But that—the distinction is exactly why the plaintiffs have failed to provide any valid excuse for their delay here, and we know that because Joseph Thomas, he discovered in 2012, before DOJ pre-cleared the Senate plan, that there was a Section 2 violation, in his opinion, based on the numbers that he saw. He testified to that at trial and in his deposition. So every one of these plaintiffs could and should have discovered their claims based on publicly available data in 2012. Well, why shouldn't—I mean, so these Section 2 challenges to at-large districting schemes still happen today. And why—it was known in the 80s and the 90s and 15 years ago that they weren't electing enough and those are routinely allowed, there's no statute of limitations, and Latches hasn't barred those cases. Well, there are two things. As far as I know, they are much more rare now. But I think even in an at-large case, if there were evidence like this where you knew the factual basis of your claim for several years and then still just didn't bring suit, then that is going to be a problem for Latches. But the fact is that Latches is a flexible, equitable doctrine, and we do have to take each case as it comes. And the reality is that in a modern Section 2 case with single-member districts, it is common to sue either immediately after a plan is approved or, in Texas's experience, even before the legislature approves a plan, people will file lawsuits. Because the fact is, you can look at the numbers and determine whether you had a suit. The district judge abused its discretion when it found that the plaintiffs were excused, both on legal and factual grounds, because it applied a subjective knowledge test to the two plaintiffs other than Thomas. And for Thomas, it provided no excuse for the delay from 2015 to 2018. And the excuse that the Court provided for 2012 to 2015, there was no citation to the record, and it just doesn't make sense. The fact that he ran in the election wouldn't address the alleged Section 2 violation. Actually, Mr. Frederick, the Court said that had Thomas filed in 2015 or before, he claims the Court would have declared his complaint premature because there was a voting age majority. The District Court says that. Judge Jones, I just don't think that's true. People file Section 2 claims before any election has happened all the time. That's why experts look at exogenous elections, reconstituted elections. There is a way to prove these, and that's what people do. Before I run out of time, I want to be sure to touch on prejudice. And here it's important to frame it by noting that the amount of prejudice that must be shown is inversely proportional to the delay and the lack of an excuse. Here, there's a long delay with no excuse, so the bar is low. I would submit that the federalism costs of disrupting a legislatively enacted plan are enough to show prejudice, but beyond that, the record shows at least four specific examples of prejudice that result from the plaintiff's delay. I'll go through them quickly. The compressed trial schedule. We addressed this in our brief. This is a product of delay because the District Court said this was the earliest trial setting he had. Second, compressed time for remedy. That is a huge problem for the legislature. Third, late decade redistricting with stale data virtually guarantees that whatever you do will be malapportioned, and if we take one person, one vote seriously, that's a problem. Finally, thank you. May it please the Court. John Greenbaum for plaintiff's appellees. Joseph Thomas at all. I'm going to say a word about the merits, but then spend the first part of my presentation about mutinous since it seems the Court's most interested in that. This case is actually a good example. Mr. Walsh was talking before about not having the equal opportunity to elect, and what we saw with the history of District 22 going back four elections was that African-American voters did not have an equal opportunity to elect their candidates of choice, and then after the 2019, we saw that with the revised district, in fact, African-American voters did get to elect their candidate of choice, Mr. Thomas. Now let's talk about mutinous. I'm going to agree with something my colleague Mr. Wallace said. Every decade's a brand new day now when it comes to redistricting, and that's why this case is moot, is that there's not going to be another election under this plan, and so there's nothing that this Court can do to, in effect, change the result of what happened here, and that's why this case is moot, and we know that when an event happens, when a case is pending on appeal, that renders the case moot. That ends things because you have to have a case for controversy at all stages of the litigation. Hasn't this Court said, however, that mootness has to be particularly flexible in regard to the election cycles? We've said that more than once. Except for here, what you're talking about is an election cycle which is over. Well, it's over only because the Court forced it to occur under what is arguably an illegal plan. I'm going to dispute a couple things. Number one, the Court didn't force it to occur. The election happened in November of 2019 like the election would have happened whether this case would have been brought or not. The election happened at its normal time. And the way a lot of courts have handled these situations is to issue a declaratory judgment and then let the election go forward because under elemental principles of federalism, it's not supposed to interfere with the machinery of the electoral process. And in this particular case, what we actually saw was minimal to no interference with the electoral process. We're talking about eight precincts which were moved. And how many thousand voters? A couple thousand voters. But the ultimate difference is there's no allegations from the election. In fact, in June, before the oral argument before the panel, Mississippi made the argument that, hey, the panel can decide right now that the lines will revert back to what they were before and we can make the election happen in a week. We can send out ballots in a week when they had been planning to do the opposite. The State of Mississippi, the Secretary of State had multiple opportunities to brief the court about whether there were actual problems with having this election go forward as it did, and there was nothing. Well, what you're talking about is prejudice, but I thought what I said was that courts are supposed to look at mootness in a more flexible way when there are elections involved, period, as a matter of federalism. And, and you might be, you might be talking— Not to the district court. Sure. And I'm not, I'm not quite sure what, what, what case you're citing, Your Honor, for that or what, what in an elections context there are similar facts that— I wrote one of them, V.C. v. Abbott, but I'm not, I, you know, we've, I read a lot of cases to prepare for this argument. I know it's in there. Sure. And I believe in V.C. versus Abbott, we weren't talking about something that was going to be no more elections. It's a Carter I.D. case, but the point is it was, this court actually in the first— Sure. You know, en banc decision had said, whatever you do, you can't interfere with the 2016 election and the, you know. So let's go back through the, the history. We were involved in that case as well. In, in 2014, about a month before the election, the district court made a finding of liability, finding that Texas's voter I.D. law violated the Voting Rights Act and the Constitution. And this court stepped in and stayed, stayed that decision. In 2016— You're talking about V.C.? Yes. Okay. We can agree to disagree, but as the other counsel did, you can also accept my proposition that mootness is more flexible and we can move on if that, I don't want to waste your time. Well, Your Honor, I don't want to waste my time either, but I think it's, I think, I think the V.C. case actually stands as factually very different in terms of what happened during the course of that case. May I direct? Sure. I don't mean to interfere with a critical part of your argument. You can come back to it. But, um, now you're making me forget what I was going to ask you, uh, is the, um, mootness, the, uh, damn it. You got me off my track. Okay. I'm sorry about that, Your Honor. We agree with you that it is moot, but we also— They could— Under Munsing where we should vacate the district court. Do you then agree with opposing counsel that there's nothing else that needs to be done? That was my question. Well, there is, I would say, I would, I would say whether, if you find that this case is moot, whether you choose to vacate it or not, there's nothing, there's nothing else that needs, that needs to be done. I mean, we did make the argument in, in our papers that, um, this is not an appropriate case for a vacator. Right, but they disagree sharply with that. Sure. Are you in agreement with them that if we do vacate the district court, then there really isn't anything? There isn't any, there isn't anything further to be done. But, Ken, in that circumstance, you seem to disagree with the notion that the Senate can show up and say, oh, we're getting rid of Thomas. Correct, Your Honor. Explain that to us. Sure. So, so for a number of reasons, and we'll, we'll start with the, uh, the relevant, uh, provision of the Mississippi Constitution, which says that apportionments, and talking now about apportionments for senators, each apportionment shall be affected for the, for the next regularly scheduled election of members of the legislature. So the Constitution says, okay, you can't come back after an election and then if you, if the districts are effectively redrawn, come back and have a new election. And I think Judge Haynes, for the precise reasons that you raised, that if, okay, let's say the legislature doesn't like somebody who got elected to office, okay, they can just simply enact a new, uh, a new redistricting plan and effectively kick that person out of office. But wouldn't that require a new lawsuit? I mean, what's to prevent a new lawsuit if, uh, in the, the state has refused to take a position about that, or the governor has, because he said that's up to the, to the Senate or legislation or whatever. That's a different case, it seems to me. We can't, we can't, we can't make a premature ruling about what the Senate can or cannot do if we, if we vacate the district court. And it sounds to me, if you agree to vacate the district court decision and they don't object to vacating or they want the district court, why are we here? Well, it's a good question in terms of, of, of why we're here. And that, that is actually our point on mootness is now that the election has passed and there's going to be no further elections. I thought the disagreement was whether vacater could occur here, but if you both sides agree that vacater can occur, then the district court opinion is gone. Well, we took the, we took the position in our papers and we still take the position that vacater is, is not the way to go here, but it is a decision that this court can decide de novo. There's no, you know, there's nobody to defer. There's no district court to defer to here. If you decide that the case should be vacated based on the two things that, that, that Supreme Court says to look at, fault and, and the, the equities, then that's correct. There's nothing more for this court to do. But do you agree with Judge Jones's decision that we have no business deciding prematurely what, if the Senate were to take some action, whether or not it would be lawful? Correct. I, we're not, we're not, we're, it's not the case, well, this, this court can choose to take that up if it wants to. As we briefed, as we briefed, we believe that it would be inappropriate and against the law for, for Mississippi to do another redistricting, create another special election for multiple reasons. I mean, one is the constitutional provision. Second is the history of voting rights litigation in Mississippi. And you have a number of instances during the history of Mississippi and where there have been requests for special elections after something had happened, including after the 2012 redistricting here in Mississippi, where you had my colleague, Mr. Wallace, arguing on behalf of Mississippi that special elections were inappropriate after the, after the, what you had here was an election in 2011 under old lines which violated one person, one vote. And then you had in 2012 a request from, for a special election from the plaintiffs in that case after the redistricting had been done to say, okay, let's, let's have an election under the new lines which are consistent with one person, one vote. And the court and Mr. Wallace followed Mr. Wallace's position and Mississippi's position that doing a special election would be a drastic remedy. And that, um, and the, and, and the, and the court denied it. And if you look at the history of Mississippi, that has consistently been the case where  I think the reason why this came up was in response to our question, is the case moot, your counsel opposite said no because the Senate can undo all this. Right. So that's the reason why, while we can't prejudge action that hasn't happened, we have to analyze the potential for that as part of the question of mootness, or don't we? All right. So in our, in our view, the proper analysis of it is that Mississippi cannot simply pass a new plan or revert back to the old plan and create a special election in these two districts. And it's, it's against the Mississippi Constitution. Relevant to determining mootness. Let's say you both agreed that tomorrow, if we vacated everything, the Senate could convene and undo Thomas's election. Would it then be moot? Would the decision in this case then be moot? Yes. Okay. So you don't think it matters whether the Senate undoes or doesn't? I'm sure you think it matters because it does. But you don't think it matters to the question of mootness? I don't think it matters to the question of mootness, Your Honor. Let me ask you one other thing about it. Is there anything in Mississippi law that would allow the Senate to disqualify these two senators? No. I mean, can they, Judge Haines said, can they just have coffee one morning and decide they won't, don't want two of the senators in? No, they cannot, Your Honor. Do they have to have some ground in state law to do that? Well, let's, let's say you, let's say you had a situation and, and the, and the provision that Mr. Wallace has cited has, the context in which it comes up is where there's an issue at the time of the election, whether, whether the person running for senator is, is a resident of that district, right? That's, that's what that provision was designed to sort of handle or other, or didn't meet what any, any of the other qualifications. Let's say there's an age qualification, for example. So let's say the person running for office was 19 years old. They wouldn't meet the age qualification. Then the Senate can step in and say, no, you don't meet the qualifications for office. You're out. And that's how we've consistently seen that in, in the case law that, that provision applied. Mr. Greenbaum. Yes. After your time's up, I had a few questions about latches in section two.  Just think of these three and then answer them as you will. Okay. Under latches, you just heard that the closest case given is the Fourth Circuit, Maryland citizens case. Mm-hmm. Respond to that. Sure. And number two, under section two, um, I have had the benefit of both of you arguing at the panel level, but I'm still unclear about these two points. Mm-hmm. Is this case, uh, is this, is a dilution, dilution case always essentially the functional equivalent of a cracking case? And then the last thing I'd like you to address is, um, as you know, I wrote separately about Salas. Mm-hmm. One was, was a Salas heightened proof urged at all to the district court? And whether it was or wasn't, is, what's the distinction between voting age majority and registered voter majority? Those three questions. Okay. So let's, let's start, let's start with the latches. Um, back, going back to just Judge Costa's question, I mean, what you typically see here is you see deference to the district court, no matter what way the district court decides. And so you don't see a lot of reversals on appeal one way or the other. And we have cases that, where there were several elections, um, in our case, we only had one, several elections during the election cycle. You had cases that, where the, the trial of the case happened closer to the election. You had cases where there was greater disruption to the election process. And in all those cases, the district court. Yeah. Sure. Sure. Uh, the section two question is cracking or packing required under section two? No. And there are, you know, I've been a voting rights lawyer for 20 something years now. And you don't see in every case where people challenge districts on section two grounds that there's a requirement of cracking or packing. Um, you know, one case that's particularly notable is, uh, the Seventh Circuit case, uh, from, from 1984 involving Chicago, in which the courts, in which the district court had said no cracking or packing, no, no violation regarding intent, but a violation regarding section two results. And I think that's a good example of how you don't have to have cracking or packing. It's really sort of a semantic term too. I mean, you can make the argument here that, okay, there was cracking involved because what you have is the Mississippi Delta is a large area, predominantly African American. This district is on the edge of the Mississippi Delta. And what the legislature did was it included some area that was outside the Delta and originally. And what they did as a remedy is they brought more of that Delta population in. So. If I may interrupt here, uh, uh, there's, this case was not tried as a cracking case, correct? Your Honor, we didn't, we didn't use the term cracking, but as I said before, it's merely a semantic term. I don't see anything in the district court opinion that talks about the basis on which the Mississippi legislature created this district. And therefore it is not a finding, it seems to me, to which we owe any kind of deference or can impute that there was implicit cracking. Okay. I would agree with that now, but what I would say is you will not find a single, you will not find cases which say that what you have as an example is where you can draw a district that complies with Jingles 1, is majority minority and reasonably compact, and that you fail Jingles 1 because you haven't established cracking. There's no case that finds that. I mean, the district court says the state doesn't challenge Jingles 1. Mm-hmm. You didn't challenge. I mean, it was just. Yes. So there's no finding on it. But going beyond that, I just have a question for you as an expert in this area. How often are there cases that come back after statewide redistricting where a plaintiff challenges one single district out of that entire ball of wax and says that single district violates Section 2? It's happened several times. It might be one district. It might be two districts. But all you need. No, no. The reason I ask is that Section 2, to me, theoretically looks at the composition of the entire legislative body. Okay. At least that's the way all the cases I've ever been involved in and many of our colleagues have been involved in have evolved. There were challenges to the entire, which is why the cracking and packing became legitimate. As opposed to cherry picking an individual district after the legislature has made their multifaceted, as we know, very complex, very political decisions and come back and say, well, wait a minute. You fail on this one deal. Well, Your Honor, Lulak v. Perry, the Supreme Court, upheld a Section 2 violation that was specific to one district. And I understand that more districts were challenged in that litigation, but the finding was specific to that one district. And also, in this case, what you have is, if you want to look at the plan as a whole, a disproportionately low number of majority black districts. Well, but we're not allowed to do that under Section 2. You're allowed to consider it. The other thing that bothers me about this is, if a plaintiff cherry picks an individual district after the fact, then you have the reality of what the district court did here, which was, within two days, adopt Plan 1, proposed by the plaintiffs, with no findings or conclusions at all, that provided a 60 percent super majority of minority voters, and took them from another district. Now, the whole point is, Section 2 is a balance between the rights of minority voters and the continuing right of the legislature. Then you are extracting from the overall vision of the legislature for districting, which is why the court shouldn't have stuck its nose in there with Plan 1 and then held the force the legislature to do a tiny redistricting, where it should have been able to look at the whole picture. Well, the legislature wanted to look at the whole picture it could. And ultimately, what the legislature did was, in response to a panel of this court, Your Honor— But your plaintiff, or other plaintiffs in Mississippi, who may have run in marginal districts, and I don't know what marginal, whether that's fifty-five percent or fifty-four percent or fifty-eight percent, they can each come back in so many districts until they reach a proportional number within the population and say, oh, if we had had three percent more, we could have won. And eventually, you cherry-pick the entire state and you destroy the whole map. Obviously, it's not what happened here, though, Your Honor. Well, it is a potential from this cherry-picking that I'm talking about, which is why I asked you how many cases there are that have come back after the fact, challenging single districts. Well, I gave you one, Your Honor. Lulek v. Perry. Could you get back to my point? No. Sure. Your third question about Salas. Sure. Sure. Salas question. Well, you know, obviously there's going to be a difference between the two. I mean, in the Salas case, you had a situation where the voter registration was very high compared to the citizen voting age population. And the court said, well, what you can infer from that is that the Latino population in there was less of the differential in terms of participation. I mean, here, you know, in Texas, you can use, as probably most of the court knows, you can use Spanish surnames to come up with an estimate of Hispanic eligible population in Texas. Here, you had a situation where we have two measures, right? We have voting age population, and then through a statistical analysis, we can do turnout. We can't do registration. Typically, what you see is that voting age for minority populations, they typically register to vote, and they turn out to vote at lower rates than white voters. And so a voter registration population that is over 50% is a tougher fact for plaintiffs to overcome as opposed to a voting age population that is over 50%. I think, you know, I talked to you before about the case out of the Seventh Circuit from 1984, and that was an example where the court used to use the 65% rule. Total population is roughly 65%. Voting age population is 60%. And then you account for, after that, differentials in registration, differentials in turnout. So when you're talking about turnout, it's, or you're talking about registration, the fact that it's majority registration is going to produce a much weaker case than if you have majority voting age population. What about Mr. Wallace's point that you would have to assume that the lack of registration is something the state is causing by, you know, making it difficult to register, et cetera, et cetera, rather than just people don't feel like voting, they don't feel like registering and, you know. Your Honor, yeah. Does that make sense? That differential between inability to register and, like, if you're not a citizen or if the state is making that difficult versus just lack of desire. Well, you look, I wouldn't, I wouldn't create that dichotomy. And in fact, you know, when you look at Totality of Circumstances V, it talks about the fact that if you have a history of discrimination and you have socioeconomic differences and you have turnout differentials, that those things are all linked together. And that's, in effect, what we, what we have here. We're talking about the Mississippi Delta, very bad history of discrimination and voting in other areas, significant socioeconomic disparities, you know, poverty rates of African Americans, four times that, that of, of whites. And what that means is it makes it more difficult to go out and vote if you're not able to take time off from work, if you live in a rural area. There are sort of barriers to, well, but that's separate. Yes. So barriers. They're related. Maybe I can register online, but then I show up at the high school nearby to vote. Those are two separate issues. I may be able to do the online registration or not, because maybe I don't have access to that given my poverty level, but let's say I can do that. But then I can't take the time off from work or get to the, the, the, the high school is kind of far away. But aren't all of those relevant to this consideration? Yes, Your Honor. And what you have here is you have a situation where the, the African American voters that turn out ultimately at a lower rate than whites. And you had evidence from our plaintiff, Mr. Lawson, talking about the challenges that African American voters have in turning out in these elections. And you, you didn't, you didn't have any evidence on the other side to rebut that. So it's. But the district court said the plaintiff's quote, although not required to prove a causal connection between the Senate factors and a depressed level, close quote. Right. The court said we weren't required to approve, approve that, which is correct in our view, but that we put evidence in the record to, in fact, prove it. That was not rebutted. All he says is likely negatively impact. Well, we had evidence in the record for Mr., for Mr. Lawson, Your Honor. So we turn out a light, turn a likely finding into a finding. Yes. In this, in this, in this case, yes, because we had, we had the statistics showing a difference, a difference in participation. There were a lot of issues. Sure. Sure. Thank, thank you, Your Honor, for mentioning that. I want to make sure I caught everything that, all the questions that you wanted to ask. Yes. 22 U.S.C. 1984 has been consistently, the plaintiff's reading of the language is that it only applies three judge courts to when there's a constitutional claim. And that's the way it's been consistently interpreted. It's the most natural reading of the language. It's the way it's been consistently interpreted by the courts the last 40-something years. There's not a single case where there's only been a statutory claim. This is an issue of first impression, right? No. No, it's not an issue of first, maybe at the circuit court level, it is an issue of first impression. But you, you had, nobody raised this issue. I'm not going to answer on this one. You are not, you are not, you're not bound in terms of Supreme Court precedent or past Fifth Circuit precedent on this. But it's the most natural reading of the language, particularly in the context of what was happening in 1976 was Congress was trying to limit where three judge courts applied here. Here's the difficulty I have. Because I find this to be an extremely close and interesting question. I would agree with you if it had just said the constitutionality of the apportionment of congressional districts and the statewide legislative body. I'd agree with you if, let me see here, if they had actually just used numbers to divide up how this analysis would work. The problem I have is that this language is frankly hard to decipher. You know, it hasn't been for the courts for the last 40-something years. You have a number of courts, it is an issue of first impression, but the natural reading that everybody has given it up until now is it's an issue of first impression in this court. But in a lot of contexts, courts, when dealing with only statutory claims, have made the decision that those claims are in front of a single judge. And there's not a, you will not find a single court out there that says when you only have a statutory claim that it goes in front of three judges. And we've had, what, four rounds of legislative redistricting since the statute was changed in 1976. Hasn't the Supreme Court said that when interpreting the three-judge statute, we do so narrowly as basically a tiebreaker if there's a close call? Absolutely. And it's notable that in this case, this was an issue that was raised a week before trial. And I understand it's jurisdictional. Well, for what's worth, I agree that this was really way too late. If this were a substantive matter, then it would be waived. But I think this is jurisdictional, isn't it? That's certainly a matter. We're not, we're not, you know, there's been, there was some discussion back and forth over whether it's jurisdictional. Assuming that it is. Our court, I think in an unpublished opinion, allowed the argument, even though it was made for the first time on appeal, because it's jurisdictional. Mm-hmm. It's the most natural reading of the statute is that it would apply to both, especially in the context of the idea that what Congress is trying to do is limit cases in front of three judges. And notably, there are a number of other provisions of the Voting Rights Act where the Voting Rights Act itself says three judges. So section 5 cases, section 203 claims, poll tax claims, the Voting Rights Act itself says that. Does not say that in this context. That when Congress amended section 2 in 1982, could have easily said for state legislative cases in front of three judge courts. Thank you, ma'am, you're on. Thank you. One of those is mine, I think. I'm sorry. May it please the court, I want to begin with addressing Judge Jones's first question. I want to get to Judge Ho's question about jurisdiction, and I want to finish with Judge Higginson's questions on the substance, if we can. What the judge said is that if the case had been brought before 2015, the state would have said it was premature. I don't know what the state's lawyers would have said in a hypothetical case that would never brought. Our position is this cause of action accrued in 2012. Plaintiff's position is this cause of action accrued in 2012. Mr. McDuff said so at the summary judgment argument. They could have brought this case in 2012 and given everybody plenty of chance to know what the rules were. They could have brought this case even though there hadn't been even one election, because they could have used Rodriguez's reconstituted precinct analysis. When you think you have a problem and there haven't been any elections yet, you look at those precincts to see how they performed in other elections, and you have an expert to predict how they would proceed now. In 2015, you had Senator Thomas' neighborhood in Yazoo County brought into the district for the first time. Those precincts were never analyzed by the expert in 23, 27, 2011. It's not there. There's only one election that had those precincts, and that's 2015. They could have done the many elections that Teague required. They could have certainly done more than the one election that Randhell says isn't enough. If they had used, if they had just analyzed the real districts, they decided. Well, what are you saying the ultimate prejudice was? Your Honor? I'm assuming the first part of your argument, what's the prejudice? Well, there's plenty of prejudice here, and the prejudice, among other things, is to the legislature. If they brought this case in 2012 or even in 2015, you would have had whole sessions of the legislature to do what Chairman Flowers says we do. We have public hearings. We put the plans online. We ask people what they think. That's what the legislature does if you bring the suit on time. In the middle of the legislative session, they didn't do any of that. They went up and down the hall looking for people who had votes they wanted to trade. That is prejudice. That's the prejudice that happened here, but the real prejudice that worries me is the prejudice to the candidates. This record shows five people paid good American money to run in this district, Senate District 22, and then they had the rug pulled out from under them. They went through three different districts in three weeks, and they didn't know what to be knocking on in the middle of the campaign. Mr. Greenbaum says we didn't prove any of that. I hope we don't have to subpoena candidates to get away from the voters, come into court, and say, yes, it's confusing to run for office when I don't know where my district lines are. That's the real prejudice in this case, and there's no excuse for it. I do want to say a word about the Constitution, about the jurisdictional action, because it's clear there is no binding precedent. It is clear that this sentence can mean two different things. Why in the world is the second use of the apportionment of in here? It's one of two things. It's surplisage if you construe it the way the district court did, and he admitted it was surplisage, and he acknowledged you're not supposed to ignore real words. Otherwise, if you apply this series choice, then it's a determiner. It sets it off from the rest of the sentence. What this sentence can be read is saying you have to have three judge courts in order for any suit challenging the apportionment of a state legislative body. That's what should have happened here. It's jurisdictional, and there should have been three judges in this case from the beginning. No. It's ambiguous. I think when you apply the canons of construction, it becomes in our favor, because if you've ambiguous language, you go straight to the canons. That's what Congress would have done in 1976, and they wouldn't have put in three words that had no meaning. So when you look at the canons, we win, and it should have been a three-judge court. Your Honor, I don't know that solace was argued to the district court, but what was argued to the district court was the principle that if you have a majority of the electorate, then you have to prove something to show that there's a reason why that majority can't function as a majority. We talked about Lou Lauke v. Perry, and we said the reason of non-citizenship doesn't apply here. We certainly talked about whether or not the depression was caused by unconstitutional behavior. As you know, I acknowledged what Deasy says. If you get there, I want you to overrule it. It's in the committee report. It's not in an act of Congress, and courts can minister acts of Congress, not committee reports. You have to prove something unconstitutional caused your injury, and we argued that loud and clear to the district court. Is a dilution case always a cracking case? Our brief looks at Shaw v. Hunt. Shaw v. Hunt says what you do to prove in a single-member district case is you allege that lines were manipulated so as to pack and crack to the disadvantage of the minority. There is no allegation here of that. I appreciate you bringing up Shaw, because I read Shaw to say that in a Section 2 dilution challenge to a single-member district, you have to show cracking or packing. It's certainly what that language says. I didn't find the word exclusive in the sentence I quoted, but they tell you how to do it, and these people didn't. ... two options, and Mr. Greenbaum says this is a functional cracking case. I fail to understand that. Can you explain that to me? Functional cracking is what I told the judge at the middle of the start of the trial. This is a case about math. It's where you draw the lines and what color the people are inside it when you count them. That's what he means by functional. He means we could draw a different set of lines that gives us a bigger black majority, and that's functional cracking. It doesn't seem like a cracking allegation. No, it's a violation of Miller. It's a violation of Shaw. It's a violation of the 14th Amendment. Wasn't Shaw a gerrymandering case? Shaw was a gerrymandering case. That requires proof of purposeful intent. But that is what the plaintiffs asked this court to do. They said, with no proof of disadvantage, I've told you what was wrong with the proof. We have to have 60 percent, and you go get them for us, and we don't care where they come from. That, we think, is a violation. And if they don't want it affirmed, Vacation will do fine with us. We thank the court. Thank you, counsel. The court will take a brief recess.